### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| vs. | ) | Criminal No. 9:23-833-RMG |
| | ) | |
| Peter J. Strauss, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |
| | ) | |
| _____ | ) | |

This matter comes before the Court on Defendant's motion to recuse. (Dkt. No. 26). Defendant asserts that the Court's findings and comments made on the record in an earlier, related civil proceeding mandate the Court's voluntary recusal or disqualification. The motion is made pursuant to 28 U.S.C. §§ 144 and 455 and the Due Process Clause of the Fifth Amendment. The criminal case before the Court involves a charge that the defendant, Peter J. Strauss ("Strauss"), knowingly transferred and aided and abetted the transfer of funds on behalf of clients to avoid lawful seizure orders of the United States. The previous civil case involved allegations that these same clients had converted funds provided by an investor to their own personal use and then passed those funds through the trust account of Strauss' law firm to be distributed to other persons and entities for the clients' benefit. Defendant pled guilty before the Court to the pending criminal charge on November 6, 2023, and he moved to recuse on December 6, 2023. For reasons set forth below, the motion is denied.

### Factual Background

It is important at the outset to understand the complex factual setting of the original civil action that came before the Court involving Defendant's law firm and the alleged use of its trust account to facilitate the transfer of funds converted by clients of the firm, Jeff and Paulette Carpoff,

1

(the "Carpoffs"). The Carpoffs were principals of a company, DC Solar, which manufactured and promoted as investments solar powered generators that could provide emergency power on an environmentally sustainable basis. Most notably, purchasers of the solar powered generators qualified for a generous tax credit, and DC Solar generated hundreds of millions of dollars in investments. Among these investors was East West Bank, a California state-chartered bank.

On December 17, 2018, the East West Bank transferred $13 million to Solar Eclipse Investment Fund XXXV ("the Fund"), which was an entity used to purchase solar powered generators from DC Solar. The Fund was one of many related entities under the control of the Carpoffs. Unknown to the East West Bank, DC Solar and the Carpoffs were at that time under federal criminal investigation for operating a Ponzi scheme and money laundering operation. One day after the East West Bank made its $13 million dollar payment to the Fund, December 18, 2018, federal agents executed search warrants on the Carpoffs' residence and business operations. The Government also issued seizure orders seeking to take control of all accounts associated with DC Solar and the Carpoffs. These law enforcement activities were widely reported in the press.

The day after law enforcement searched their residence and businesses, December 19, 2018, the Carpoffs wired $5 million from the Fund's bank account to the trust account of Strauss Law Firm. A day later, on December 20, 2019, $2 million of those funds were transferred out of the Strauss Law Firm trust account to another law firm to pay for the Carpoffs' future legal services. By December 28, 2019, another $2 million of those funds were transferred out of the trust fund of Defendant's law firm, again for the personal use and benefit of the Carpoffs. By February 1, 2019, all of the $5 million transferred by the Carpoffs to the Strauss Law Firm trust account on December 19, 2018 had been wired to others for the personal benefit of the Carpoffs.

DC Solar filed for bankruptcy in Nevada on February 3, 2019, and the Carpoffs were removed from control over many of the investment accounts related to DC Solar, including the Fund, where the East West Bank had transferred its $13 million. On March 13, 2019, the Chief Restructuring Officer of DC Solar informed the East West Bank that $5 million of its investment funds had been improperly transferred by the Carpoffs to the trust account of the Strauss Law Firm. (C.A. No. 9:19-1176, Dkt. No. 9-2 at 4).[1] Counsel for East West Bank communicated with Strauss by letter dated March 22, 2019, informing him that the funds which the Carpoffs had transferred to his trust account had been "fraudulently obtained and disbursed." (*Id*. at 8-9). Counsel for East West Bank asked Strauss for an accounting of these funds and details about disbursements and authorizations provided. Strauss responded by email on March 25, 2019, claiming that the funds transferred into his accounts were the lawful property of DC Solar and that further details should be sought from the bankruptcy trustee for DC Solar. (*Id*. at 10). On March 26, 2019, East West Bank counsel requested from Strauss information concerning his law firm's role in these illicitly obtained funds. (*Id*. at 11). Strauss provided no response to this second letter.

Strauss received additional correspondence from the newly appointed manager of the Fund, Curtis Jung, on April 9, 2019, stating that it appeared that the transfer of the funds to his law firm's trust account was improper. Jung asked for further details of the circumstances under which the law firm's trust fund received the funds and demanded the return of the $5 million. Noting that "time is of the essence," Jung demanded a response by April 12, 2019. (C.A. No. 9:19-1176, Dkt. No. 9-3 at 6). Strauss responded by email on April 10, 2019, without providing any details

---

[1] Citations to the civil case docket will be identified by reference to the civil action number, 9:19-1176. All references to the criminal case docket will simply refer to the docket number.

regarding the circumstances surrounding the receipt or disbursement of the $5 million and referred all communications to the DC Solar bankruptcy trustee. (*Id*. at 7).

East West Bank and the Fund filed suit against the Strauss Law Firm on April 23, 2019, seeking an accounting and return of the $5 million and the issuance of a preliminary injunction and temporary restraining order ("TRO") relating to any funds still in the Strauss Law Firm's trust account. (C.A. No. 9:19-1176, Dkt. No. 1). Plaintiffs attached supporting documents to their motion. (C.A. No. 9:19-1176, Dkt. Nos. 9-2, 9-3). The Court issued a TRO on April 30, 2019, directing that none of the funds related to the $5 million be transferred from the Strauss Law Firm trust account and prohibiting the destruction of any relevant records. In granting the TRO, the Court noted the highly "fungible" nature of funds transferred to the law firm's trust account and made a finding that Plaintiffs "are likely to succeed on the merits" of their claims that the Carpoffs had improperly transferred the funds one day after they "became the target of a federal raid related to a money laundering investigation." The Court set a hearing on Plaintiffs' motion for a preliminary injunction for May 6, 2019. (C.A. No. 9:19-1176, Dkt. No. 14 at 6). The Strauss Law Firm filed a response to the motion for preliminary injunction indicating the $5 million at issue had already been transferred out of the firm's trust account. The Strauss Law Firm further asserted that the "subject funds implicate[]" the DC Solar bankruptcy, which, if true, would require a stay of the current civil action before the Court. (C.A. No. 9:19-1176, Dkt. No. 21 at 2).

Immediately before the May 6, 2019 hearing, counsel for the Strauss Law Firm produced records detailing the wire transfer of the $5 million into the law firm's trust account and nine separate wire transfers out to persons and entities for the personal benefit of the Carpoffs. Counsel for the Strauss Law Firm appeared at the hearing but informed the Court he lacked knowledge regarding many of the critical details related to the receipt and disbursement of the $5 million.

4

(Dkt. No. 26-1 at 3-4, 6-7). The Court advised the parties that it would schedule another hearing three days hence, on May 9, 2019, and directed that Strauss appear at that time and "produce all the documents related to the instructions he received for these transfers." (*Id*. at 11). The Court asked the Strauss Law Firm's counsel whether he anticipated any problem having Strauss appear for the May 9, 2019 hearing. The law firm's counsel responded by indicating he would "call him when we walk out of the courtroom," which the Court viewed as an equivocal response. The Court, making it clear its directive for Defendant to appear was an order, not a suggestion, stated: "Let him know that if he seems to have difficulty getting here, I'm glad to have him escorted by the marshals." (*Id*. at 13).

The Court addressed at the May 6, 2019 hearing the Strauss Law Firm's assertion in its May 3, 2019 response that this dispute was subject to the DC Solar bankruptcy action and, thus, to the automatic stay issued by the Nevada Bankruptcy Court. The Court informed counsel that it had checked the publicly available filings of the DC Solar bankruptcy action on the ECF and did not see any listing for the $5 million transferred to the Strauss Law Firm. To show proper respect for the jurisdiction of the bankruptcy court, the Court made contact with the presiding bankruptcy judge to determine whether there might be a claim that these apparently converted funds by the Carpoffs were part of the DC Solar bankruptcy estate. The bankruptcy judge indicated that further factual development on the issue might be necessary but for now the Court was encouraged to continue its efforts to repatriate the funds and then sort out later their relationship, if any, to the bankruptcy estate. The Court fully disclosed these discussions with the Nevada bankruptcy court at the May 6, 2019 hearing and indicated the Court would continue to consider the issue of whether the Court's action was subject to the bankruptcy court's stay. (*Id.* at 11-12).

Following the conclusion of the May 6, 2019 hearing, the Court extended the TRO to

the nine recipients of the funds transferred from the Strauss Law Firm trust account and ordered that they not disburse or expend any of these funds until further order of the Court. The Court further ordered Strauss to appear at a hearing on May 9, 2019. (C.A. No. 9:19-1176, Dkt. No. 25).

Strauss appeared at the May 9, 2019 hearing. By this time, the Court had received sufficient documentary evidence to support the conclusion that the Carpoffs had unlawfully seized investment funds from the Fund that had been provided by East West Bank and that the Strauss Law Firm's trust account had been utilized to transfer these converted funds to nine different persons or entities for the benefit of the Carpoffs. Many details regarding these transfers were then unknown, and it appeared that Strauss was the most promising source of information to bring clarity to this situation.

The Court initially sought to question Strauss about the receipt and disbursement of the funds transferred to his law firm's trust account by the Carpoffs. Strauss declined to answer any of the Court's questions relating to these funds on Fifth Amendment grounds, indicating that his responses might tend to incriminate him. (Dkt. No. 26-2 at 9-10). Plaintiffs' counsel requested the Court allow her to question Strauss in more detail, noting that in a civil proceeding the assertion of the Fifth Amendment right against self-incrimination by a witness casts a negative inference. The Court allowed Plaintiffs' counsel to ask additional questions and Strauss repeatedly asserted his Fifth Amendment right against self-incrimination. (*Id*. at 11-32).

The record at this point provided strong support for Plaintiffs' claims that the Carpoffs had unlawfully seized and converted investment funds, and the trust account of the Strauss Law Firm had been used to improperly transfer these converted funds to others for the benefit of the Carpoffs. The quick sequence of the arrival and dispersal of these funds through the Strauss Law Firm trust account shortly after the federal law enforcement seizure operation cast further suspicion regarding

these transactions. Thus, when Strauss appeared at the May 9, 2019 hearing and asserted his Fifth Amendment right against self-incrimination, a substantial question was raised from the totality of facts before the Court concerning whether Strauss, a member of the South Carolina Bar, had engaged in professional misconduct. Consequently, the Court placed Strauss on notice that "I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today in a matter involving potential criminal activity" and suggested that Strauss self-report his actions to the South Carolina Supreme Court.

The Court issued an order on May 13, 2019, finding that Plaintiffs had demonstrated a likelihood of success on the merits that the $5 million investment had been unlawfully converted by the Carpoffs for their personal use after they became the target of a federal raid related to a money laundering investigation. The Court enjoined all recipients of the transfers from the Strauss Law Firm trust account from transferring or expending these funds until further order of the Court. (C.A. No. 9:19-1176, Dkt. No. 36). The Court also issued a text order on June 20, 2019 inviting the parties and the DC Solar bankruptcy trustee to brief the issue of whether the pending civil action was stayed by the Nevada bankruptcy court's automatic stay. (C.A. 9:19-1176, Dkt. No. 47).

The Court addressed in an order dated July 3, 2019 the issue of whether the $5 million converted by the Carpoffs was part of the DC Solar bankruptcy estate and, thus, subject to the bankruptcy court's stay. The Court noted that the DC Solar filing of unsecured creditors did not list the $5 million transferred to the Strauss Law Firm, and the DC Solar bankruptcy trustee had concluded that the funds were not part of the DC Solar bankruptcy estate. The Court, after reviewing the full record in this matter, concluded that "the $5,000,000 wire transfer of December 19, 2018, made one day after the federal government seized all known accounts of the Carpoffs

7

and related entities, was an unlawful conversion of the Fund's assets for the personal use of the Carpoffs and was not an asset of the DC Solar bankruptcy estate." (C.A. No. 9:19-1176, Dkt. No. 56 at 4).

After the flurry of activity surrounding the issue of preliminary injunctive relief, the Court's civil action progressed at a less intense pace.[2] Meanwhile, the conduct of the Carpoffs and Strauss became the subject of formal criminal proceedings. On January 22, 2020, the United States Attorney for the Eastern District of California filed a Felony Information charging Jeff and Paulette Carpoff with various financial crimes. Two days later, on January 24, 2020, both Carpoffs pled guilty. Jeff Carpoff was sentenced on November 9, 2021 to 30 years in prison and was ordered to pay restitution in excess of $790 million. (C.A. No. 2:20-17, Dkt. Nos. 11, 53 (E.D. Cal.)). Paulette Carpoff was sentenced on June 28, 2022 to a little over 11 years in prison and was ordered to pay over $660 million in restitution. (C.A. No. 2:20-18, Dkt. Nos. 11, 51 (E.D. Cal.)).

Strauss was charged under a Felony Information on October 17, 2023 related to the transfer of funds from Jeff Carpoff for the purpose of preventing or impairing the Government's efforts to seize the Carpoffs' assets. Strauss pled guilty before the Court on November 6, 2023 and agreed as part of a plea agreement to pay $2.7 million in restitution. Defendant filed his motion to recuse a month later, on December 6, 2023. (Dkt. Nos. 2, 5, 24, 26).

## Legal Standard

Two federal statues address the recusal or disqualification of a federal district judge. 28 U.S.C. § 144 prohibits a district judge from presiding in a case where the judge "has a personal bias or prejudice" against a party. 28 U.S.C. § 455 provides for the disqualification of a judge "in

---

[2] The parties in the civil action ultimately reached a negotiated settlement and the case was dismissed.

8

which his impartiality might reasonably be questioned" or where a judge has a "personal bias or prejudice concerning a party." § 455(a), (b)(1).  Any disqualification of a judge based on an appearance of impartiality must be considered from the perspective of a reasonable person fully informed of all the "surrounding facts and circumstances." *Microsoft v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, CJ).

Federal district judges routinely handle criminal cases in which the judge may have previously handled related criminal or civil proceedings.  These previous civil or criminal proceedings often result in judicial findings and statements related to the facts presented in the pending criminal case before the court   The United States Supreme Court squarely addressed in *Liteky v. United States*, 510 U.S. 540 (1994), the very limited circumstances in which previous judicial findings or statements by a trial judge in related civil or criminal cases can be the basis for judicial recusal or disqualification.  The *Liteky* court stated that prior judicial rulings "almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555.  The Court went on to state:

> [O]pinions formed by a judge on the basis of facts introduced, or events occurring in the course of current proceedings, or prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion derives from an extrajudicial source, and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Id*.

The Fourth Circuit addressed the issue of judicial disqualification based on a judge's involvement in a prior civil or criminal proceeding in *Belue v. Leventhal*, 640 F.3d 567 (4th Cir. 2011).  The Fourth Circuit stated that the case law firmly established that "parties would have to meet a high bar" to achieve recusal based on comments by a trial judge in the current or previous

9

proceeding. To meet that high bar, the judge's comments must involve "singular and startling facts" that reflect "particularly egregious conduct." *Id*. at 573. To allow any other rule, the Fourth Circuit noted, would produce "limitless gamesmanship" and would invite "a form of brushback pitch for litigants to hurl at judges who do not rule in their favor." This would make litigation "even more time-consuming and costly than it is and do lasting damage to the independence and impartiality of the judiciary." *Id*. at 574.

## Discussion

Defendant asserts in an affidavit that "I believe in good faith that Judge Gergel has a personal bias against me and in favor of the U.S. Attorney's Office, and that Judge Gergel's impartiality might reasonably be questioned." (Dkt. No. 26-3 at 1). Defendant referenced various findings and statements by the Court in the previous civil case to support his personal belief of judicial bias. The Court addresses these challenged statements and findings below.

    A.    <u>Defendant's objection to the Court's comments at the May 6, 2019 hearing that the transfer of funds by the Carpoffs to his law firm's trust account was "likely an illegal transfer" and "these transactions appear to be unlawful."</u>

The Court conducted a hearing on Plaintiffs' motion for a preliminary injunction on May 6, 2019, following the receipt of records that indicated that one day after federal law enforcement officers raided the Carpoffs' home and business sites they transferred to the trust account of Strauss' law firm $5 million dollars that had been deposited in an investment fund by the East West Bank to purchase solar generators. The record indicated that these funds were quickly wired to others for the personal benefit of the Carpoffs. (C.A. No. 9:19-1176, Dkt. No. 25 at 2-3). The manager of the investment fund from which these monies were seized and transferred by the Carpoffs had advised Strauss that the transfers were unauthorized and demanded their prompt return to the Fund. Based on these facts and many others, the Court made the following statement:

> From the information I have, it appears that the $5 million transfer to the Strauss Law Firm is likely an illegal transfer, and those recipients are in receipt of funds that should not have gone to them from this fund. The fund was to purchase mobile solar generators. It wasn't to pay all these lawyers and captive funds and all of this, and it was certainly done in a way that appears surreptitious to me. It's one day after the Government has seized every asset they can of the Carpoffs.

(Dkt. No. 26-1 at 10).

The Court issued orders on April 30, 2019 and May 13, 2019 which included findings consistent with the challenged statement. These statements and findings are exactly the type of prior judicial actions that are not a proper basis for a judicial recusal motion. Further, later developments in this and other cases have validated the accuracy of the Court's challenged statements and findings.

    B.    <u>The Court's reference to the local United State's Attorney's Office staff as "my U.S. Attorney's Office."</u>

During the May 6, 2019 hearing, counsel for the Strauss Law Firm sought to characterize the transfers into the firm's trust account as ordinary transactions involving clients of the law firm, the Carpoffs. The inference was that the Plaintiffs were overreacting and that there was nothing particularly remarkable about these fund transfers into and out of the Strauss Law Firm trust account. The Court noted the intensive law enforcement interest in these transactions, with numerous federal law enforcement officers sitting in the courtroom. This suggested to the Court that close scrutiny of these transactions was appropriate. The reference to "my U.S. Attorney's Office" was simply a shorthand reference to the fact that these particular transactions were receiving scrutiny from the United States Attorney's Office for the District of South Carolina and did not reflect any endorsement of actions of the United States Attorney's office.

    C.    <u>The Court's statement that it would, if necessary, send the United States Marshal to escort Defendant to the May 9, 2019 hearing</u>.

11

Prior to the morning of the May 6, 2019 hearing, Plaintiffs had repeatedly attempted, without success, to obtain from Strauss an accounting of the $5 million that the Carpoffs had transferred to his law firm's trust account. On the morning of the May 6, 2019 hearing, Plaintiffs were provided by the Strauss Law Firm's counsel a listing of the persons and entities which had been the recipients of the $5 million from the firm's trust account. Plaintiffs still had no details regarding who had authorized the transfers of investment funds to persons and entities for the personal benefit of the Carpoffs. During the May 6, 2019 hearing, it was apparent that counsel for the Strauss Law Firm had little knowledge concerning these missing details. The Court noted the need to summon Strauss to a hearing on May 9, 2019 to address these unanswered questions. The Court asked counsel for the Strauss Law Firm whether he anticipated any problem having Strauss appear at the May 9, 2019 hearing. Rather than assure the Court his client would be present, the law firm's counsel indicated he would have to call his client to determine his availability. The Court interpreted this response as equivocating on whether Mr. Strauss would appear as directed by the Court, which prompted the Court's statement to the law firm's counsel: "Let him know that if he seems to have any difficulty getting here, I'm glad to have him escorted by the marshals." (Dkt. No. 26-1 at 13). This statement was for the purpose of making it clear that the command to be present on May 9, 2019 was an order, not a suggestion.

The Court regards this statement, while perhaps stern, as an unambiguous assertion of the Court's authority to compel the attendance of a witness, an essential element of the orderly administration of justice. This statement reflected no personal hostility toward Strauss, only the Court's resolve that he was to appear on May 9, 2019. The challenged statement is the very type of a "judge's ordinary efforts at courtroom administration" that is not a proper basis for judicial recusal. *Liteky*, 510 U.S. at 556.

D.  The Court's statement that Defendant needed to state that his assertion of his Fifth Amendment right was based on the fact that his answers might tend to incriminate him.

The Court initially questioned Strauss at the May 9, 2019 hearing. He promptly attempted to invoke his right to silence by stating that "[o]n advice of counsel, I have to invoke my Fifth Amendment privilege." (Dkt. No. 26-2 at 9). Since the Defendant appeared unfamiliar with how to assert the privilege, the Court explained that the basis of the assertion of the right to silence under the Fifth Amendment was that the witness's responses may tend to incriminate him. It was not sufficient to invoke the privilege simply because his attorney told him to do this. After explaining the full scope of the rule, the Court asked the Defendant whether he was "asserting the Fifth Amendment right because your response may tend to incriminate you." The Defendant then responded "[y]es, your honor."

The Court provided Strauss an accurate explanation of the elements necessary to assert the right to silence under the Fifth Amendment. Perhaps Defendant found it uncomfortable to admit that exercising his right to silence required him to acknowledge that his responses to questions regarding transactions to and from his law firm's trust account might tend to incriminate him in the commission of a crime. The Defendant's discomfort with the elements of the assertion of his Fifth Amendment right to silence is hardly the basis for judicial recusal.

E.  The Court's statement that "I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today in a matter involving potential criminal activity . . . ."

Defendant objects to the Court's statement that it intended to report to the South Carolina Supreme Court his invocation of his Fifth Amendment right against self-incrimination "in a matter involving potential criminal activity." (Dkt. No. 26-2 at 33). The Court's statement followed significant record evidence that Defendant's law firm had received $5 million dollars from the

13

Carpoffs one day after their home and offices had been raided by federal law enforcement officials and these funds were rapidly transferred from the trust account of the Strauss Law Firm to third parties for the benefit of the Carpoffs. When asked under oath by the Court of his knowledge regarding the details of these transactions, Strauss invoked his Fifth Amendment rights on the grounds that his responses might incriminate him.

After considering the totality of circumstances in the record then before the Court, there was a substantial question whether Defendant had engaged in professional misconduct in violation of the South Carolina Rules of Professional Conduct. South Carolina Appellate Court Rule 407, Rule 8.3(c) imposes a duty on every licensed attorney to report actions by an attorney that raise a substantial question concerning another attorney's professional misconduct.

Defendant appears to argue that his invocation of his right against self-incrimination immunized him from a judge reporting to the South Carolina Supreme Court facts that raised a substantial question of professional misconduct. This misapprehends the application of the assertion of the right against self-incrimination. Where a defendant asserts his right to silence under the Fifth Amendment, that fact may not be used against him in a criminal trial. However, the invocation of the Fifth Amendment right against self-incrimination can cast an adverse inference in a civil proceeding. *Michael v. United States*, 526 U.S. 314, 328 (1999).

The Defendant's objection to the Court's statement appears to based on the misguided conclusion that his simple invocation of the his right to silence prompted the Court's decision to make a report to the South Carolina Supreme Court. The complete statement of the Court was that Strauss was put on notice that "I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today *in a matter involving potential criminal activity*." (Dkt. No. 26-2 at 33) (emphasis added). This "potential criminal activity" raised a substantial question of whether

Strauss had committed professional misconduct regarding the operation of his law firm's trust account. The fact that Struss asserted his Fifth Amendment right against self-incrimination did not immunize him from a judicial report of possible professional misconduct.[3]

Strauss was not the first attorney that the Court has reported to the South Carolina Supreme Court where a substantial question has been raised whether the attorney has engaged in professional misconduct. Judges have an important duty, as do all licensed attorneys, to uphold the integrity and professionalism of the Bar. Such a report is not a valid basis for judicial recusal.

> F.  Defendant's contention that the Court's review of the public docket in the DC Solar bankruptcy case and communication with the Nevada bankruptcy judge constituted an *ex parte* communication and an independent investigation by the Court.

The defense asserted in the civil case that the Plaintiffs' suit was stayed by the pending bankruptcy proceeding of DC Solar. Since this matter went to the jurisdiction of the Court over this pending matter, the Court took the assertion seriously to determine whether the bankruptcy court's stay applied to the funds transferred from the Fund, an entity separate and independent from DC Solar. As is routine when such bankruptcy related matters arise on the Court's docket, the Court inspected the public filings in the Nevada bankruptcy proceeding, which were available a few clicks away on the ECF. The Court found no reference to the $5 million transfer from the investment fund on the unsecured creditors listed in the DC Solar bankruptcy.

The Court was, however, sensitive to the prerogatives of a sister court and reached out to the Nevada bankruptcy court to avoid any unnecessary conflict or miscommunication regarding the scope of the DC Solar bankruptcy estate. Such communications are commonly made by the

---

[3] The Court has not reached a conclusion at this time concerning whether Strauss committed professional misconduct regarding transactions made on behalf of the Carpoffs from his law firm's trust account. This is a matter that should first be addressed by the South Carolina Supreme Court.

Court and received from other federal and state judges. Indeed, the Manual for Complex Litigation published by the Federal Judicial Center recommends communications between courts in complex litigation to promote judicial efficiency and to avoid unnecessary duplication. *See* Manual for Complex Litigation §§ 10.12, 20.2 (Federal Judicial Center 2004).

The Court's review of the publicly available records of the DC Solar bankruptcy docket was part of routine federal court practice, as were the communications with the Nevada bankruptcy court. The Court fully disclosed these communications to counsel and there was no suggestion or concern expressed at that time that such communications were anything but routine. Court to court communications or inspection of publicly available court records are not a valid basis for judicial recusal.

> G. The Court's reference to widespread news reports of the federal government's law enforcement activities at the Carpoffs' residence and businesses.

When the civil action was filed in April 2019, there had been months earlier a great deal of news coverage concerning the FBI's raid of the residence and businesses of the Carpoffs on December 18, 2018.[4] The substance of the news coverage from the past December was well known to the parties, the Court, and anyone else who had a passing interest in current affairs. The record before the Court contained the critical details relevant to the civil case and was far more detailed that the cursory news reports that had been made around the time of the federal government's enforcement action. What was relevant regarding the news reports was not the substance of the reports but whether they had provided notice to the Strauss Law Firm of the

---

[4] *E.g.*, "FBI Raids Home of DC Solar CEO," ESPN Website (December 20, 2018); "FBI Conducts Raid on DC Solar's Headquarters, CEO's Home," NBC Sports Website (December 20, 2018); "How an FBI Raid Indirectly Led to a NASCAR Team Shutting Down," USA Today Website (January 5, 2019). The Carpoffs prominent role as a sponsor of a NASCAR team generated a great deal of media interest in the federal government's enforcement activities.

16

federal enforcement action before the $5 million was wired out of the law firm's trust account to others for the benefit of the Carpoffs.

No party to the civil action questioned the accuracy of the Court's reference to the earlier national media reports or requested evidence to be placed in the record to confirm such reports. Had such a request been made, the Court would have taken judicial notice of the earlier news reports because they could be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Federal Rule of Evidence 201(b)(2). The late complaint about the Court's reference to the previously undisputed news reports does not provide a basis for recusal.

Defendant, in his affidavit, does not dispute the widespread national news reports concerning the raid on the Carpoff's home, but complains that the Court failed to quote statements by Carpoff's lawyers that the raid was merely a "tax dispute" and the Carpoffs "planned to grow their business." (Dkt. No. 26-3 at 5). By the time the case was filed in April 2019, DC Solar was in bankruptcy and it was apparent that this was far more than a "tax dispute." The Court's failure to quote a statement of the Carpoffs' lawyer in December 2018 during the hearings in May 2019 would certainly not be a basis for recusal.

H. The Defendant is mistaken in his belief that the Court harbors any personal bias or animosity toward him or favors the Government in his pending criminal case.

The Defendant, perhaps due to his personal inexperience in the federal judicial arena, has misinterpreted certain routine court statements, actions, and judicial findings in the prior civil case as some form of personal animosity towards him. The pending criminal case before the Court, in which Defendant has pled to a single felony count, is a fairly routine matter on the Court's docket. The Court's statements and orders in the prior civil case reflected a determination, first, to

17

determine the facts, and then, upon determining that there had most probably been an improper conversion of funds by the Carpoffs, to move expeditiously to repatriate the funds so that the Plaintiffs might have an effective remedy for the wrong they had suffered. The Court will approach Defendant's sentencing, as it does in every sentencing, with a careful review of the presentence report, including the calculation of the sentencing guidelines, and consideration of all objections, arguments of counsel, and evidence offered in mitigation. The Court's goal is to impose a sentence with is "sufficient but not greater than necessary" to accomplish the purposes of the law. The Court's prior handling of the related civil case or consideration of this motion to recuse will have no bearing on the Court's sentencing decision.

## Conclusion

After a careful view of the full record in the prior civil proceeding and in this pending criminal matter, consideration of the motion for recusal and attachments, and the applicable case law, the Court finds that there is no reasonable basis to question the impartiality of the Court based upon a reasonable person standard with full knowledge of all facts and circumstances. 28 U.S.C. § 455(a). The Court further finds that, applying the same standard, there is no valid basis for recusal or disqualification on the grounds of personal bias. 28 U.S.C. §§ 144, 455(b)(1). Consequently, the Defendant's motion to recuse or disqualify (Dkt. No. 26) is denied.[5]

**AND IT IS SO ORDERED**.

s/ Richard Mark Gergel  
Richard Mark Gergel  
United States District Judge

December 11, 2023  
Charleston, South Carolina

---

[5] The Defendant's motion also contained a request to conduct discovery. The Court finds no basis or need to conduct discovery and that motion is also denied.